**United States District Court**
For the Northern District of California

1

2

3

4                                          **E-FILED on** __05/14/09__

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  ARISTOCRAT TECHNOLOGIES,                    No. C-06-03717 RMW
    ARISTOCRAT PTY LIMITED and
13  ARISTOCRAT TECHNOLOGIES, INC.,

14            Plaintiffs,                       ORDER STRIKING PORTIONS OF
                                                CREVELT'S DECLARATION,
15       v.                                     CONSTRUING CLAIMS OF UNITED
                                                STATES PATENT NOS. 7,056,215 AND
16  INTERNATIONAL GAME TECHNOLOGY               7,108,603, AND DENYING DEFENDANTS'
    and IGT,                                    MOTION FOR SUMMARY JUDGMENT OF
17                                              INDEFINITENESS
            Defendants.
18                                              **[Re Docket No. 157, 163, 174]**

19

20

21          On March 18, 2009, the court held a claim construction hearing on the dispute between

22  plaintiff Aristocrat Technologies, et al. (collectively "Aristocrat") and defendants International

23  Game Technology and IGT (collectively "IGT") as to the construction of terms and language in the

24  claims of United States Patent Nos. 7,056,215 ("'215 Patent") and 7,108,603 ("'603 Patent") assigned

25  to Aristocrat.  In connection therewith, IGT contended that certain opinions of Dwight Crevelt that

26  Aristocrat offered in support of its proposed claim constructions had to be stricken because

27  Aristocrat failed to adequately disclose them in the parties' Joint Claim Construction Statement.  IGT

28

United States District Court
For the Northern District of California

1   also moved for summary judgment that the patents-in-suit are indefinite and thus invalid.  After

2   consideration of the claims, specifications, prosecution histories, and other relevant evidence, and

3   after hearing the arguments of the parties, the court strikes certain opinions of Mr. Crevelt, construes

4   the disputed terms and language of the patents-in-suit and denies IGT's motion seeking adjudication

5   that the patents are indefinite.

### I. BACKGROUND

7       Aristocrat, the patentee, and IGT are competitors in the market for electronic gaming

8   machines.  Both patents at issue relate to a "slot machine game system with [an] improved jackpot

9   feature."  '215 Patent at 1:1-2; '603 Patent at 1:1-2.  Both patents claim "a method of randomly

10  awarding one progressive prize from a plurality of progressive prizes using a second game to select

11  one progressive prize . . . ."  '215 Patent at 8:49-53; '603 Patent at 8:10-12.  The second game is

12  displayed on the "occurrence of a random trigger condition" having a probability related to the

13  amount the player has wagered.  *Id.*

14      The specification describes a previous method of awarding jackpots called "combination

15  based trigger arrangements."  In the combination-type jackpot, the jackpot is awarded upon the

16  occurrence of a particular game configuration (e.g., upon the occurrence of a particular combination

17  of symbols).  '215 Patent at 1:42-55; '603 Patent at 1:46-60.  One imagines cherries across the center

18  of a spinning-wheel slot machine, or a royal flush in video poker, as examples of a "particular

19  combination of symbols" that would trigger a jackpot.  According to the specification, these jackpot

20  triggers have a number of disadvantages.  First, because the jackpots are awarded upon the

21  occurrence of low-probability events, most players never see them won.  '215 Patent at 1:46-47; '603

22  Patent at 1:60-61.  Second, it is technically complex to develop a variety of games wide enough to

23  satisfy consumer demand that nonetheless have mathematically exact (and sufficiently small)

24  jackpot-trigger probabilities. '215 Patent at 1:64-2:2; '603 Patent at 2:1-6.  Third, combination-

25  triggered jackpots remove the operator's ability to vary the jackpot frequency.  '215 Patent at 2:17-

26  19; '603 Patent at 2:21-23.

27

28

The patents describe a method of awarding a jackpot using a second game which appears after the main game is complete. The second game is triggered with a probability related to the number of credits bet by the player in the base game. '215 Patent at 2:33-41; '603 Patent at 2:37-45. The preferred embodiments state that "during the feature game a second set of reel strips appears and a 'spin and hold' game commences. The feature prize score is calculated by the total of the points appearing on the centre line of all 5 reels." '215 Patent at 5:15-18; '603 Patent at 4:43-46. "Preferably, the feature game is a simplified game having a higher probability of success than the first game." '215 Patent at 4:28-29; '603 Patent at 3:57-58. This method has, according to the preferred embodiments, a number of advantages over previous jackpot systems. The jackpot award is independent of the type of main game, and therefore allows for greater flexibility in base-game type. '215 Patent at 5:21-31; '603 Patent at 4:48-53. Furthermore, the jackpot award need not be triggered upon the occurrence of some mathematically exact combination in the main game. '215 Patent at 5:31-32; '603 Patent at 4:59-60. And the game designer and operator now have greater flexibility in determining jackpot hit rates, in-game player incentives, and networked uses of the jackpot feature. *See* '215 Patent at 5:33-50;  '603 Patent at 5:3-5.

On June 12, 2006, Aristocrat filed suit alleging infringement of the '215 Patent (adding the '603 Patent when it issued) against IGT. On June 13, 2007, the court granted IGT's motion for summary judgment, holding that the patent was invalid. Aristocrat appealed to the Federal Circuit. On September 22, 2008, the Federal Circuit reversed and remanded to this court for further proceedings.

The first claim of the '215 Patent is reproduced below with the claim language for which the parties propose different constructions highlighted in bold.

> In a network of gaming machines, each of said gaming machines having a user interface activatable by a player to affect game display, each of said gaming machines being capable of accepting different wager amounts made by the player, a method of randomly awarding one progressive prize from a plurality of progressive prizes **using a second game to select said one progressive prize**, a display of said second game being triggered upon an occurrence of a random trigger condition having a probability of occurrence related to the amount of the wager, comprising:
>> making a wager at a particular **gaming machine** in the network of **gaming machines**;
>> initiating a first main game at said particular **gaming machine**;

**causing a second game trigger condition to occur as a result of said first main game being initiated**, said second game trigger condition occurring randomly and having a probability of occurrence dependent on the amount of the wager made at said particular **gaming machine**, **said step of causing the second game trigger condition including:**

**(1) selecting a random number from a predetermined range of numbers;**

**(2) allotting a plurality of numbers from the predetermined range of numbers in proportion to the amount of the wager made at said particular gaming machine, said step of allotting including allotting one number for each unit of currency of the amount wagered; and**

**(3) indicating the occurrence of the second game trigger condition if one of the allotted numbers matches the selected random number**;

triggering a second game to appear at said particular gaming machine in response to said occurrence of said second game trigger condition, said second game appearing **after completion of said first main game**;

randomly selecting said one progressive prize from said plurality of progressive prizes **that has been won**;

displaying said second game to the player at said particular **gaming machine** in response to said triggering;

activating said user interface at said particular **gaming machine** by said player during said displaying of said second game to affect the display of said second game;

identifying to the player said one **progressive prize** from said plurality of **progressive prizes** that has been won; and

awarding said one **progressive prize** from said plurality of **progressive prizes** that has been won.

## II. ANALYSIS

### A.    IGT's Motion to Strike the Crevelt Declaration

IGT moves to strike the declaration of Dwight Crevelt for failure to adequately disclose his opinions as required by Patent Local Rule 4-3(d).  The rule requires that any expert who will testify at the claim construction hearing to provide a summary of "each opinion to be offered in sufficient detail to permit a meaningful deposition of that expert."  IGT contends that Aristocrat failed to adequately disclose Crevelt's opinions in the parties' Joint Claim Construction Statement filed February 6, 2007 and that IGT first learned of his opinions when Aristocrat filed its *Markman* brief and Crevelt's declaration on March 27, 2007.

The court finds that the following paragraphs of Crevelt's declaration were not timely disclosed and are stricken:

| Paragraph of Crevelt Declaration | Opinion Not Adequately Disclosed |
|---|---|
| ¶ 7 | Prize money need not come from a "pool" and that prize money can come from any source. |

United States District Court
For the Northern District of California

| | |
|---|---|
| ¶ 10 | A second game trigger condition can occur as a result of testing a trigger condition in software. |
| ¶ 16 | The Torango Free Play apparatus was different from Aristocrat's invention. |
| ¶ 19 | The allotted number need not be identical to the selected random number for the trigger condition to occur. |
| ¶ 21 | A person of ordinary skill in the art would understand that the second feature game need not occur after the payment of winnings for the first main game. |

**B.    Standards for Claim Construction**

Construction of a patent, including terms of art within a claim, is exclusively within the province of the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996).  In determining the meaning of a disputed claim limitation, the intrinsic evidence, including the claim language, written description, and prosecution history, is the most significant. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  Words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art. *Id.* at 1312-13. Claims are read in view of the specification, which is the "single best guide to the meaning of the disputed term." *Id.* at 1315.  A court "should also consider the patent's prosecution history, if it is in evidence." *Id.* at 1317.  Finally, although it is generally less significant than the intrinsic record, extrinsic evidence can "shed useful light on the relevant art." *Id.*

**C.    Construction of Disputed Terms and Language**

    **1.    "Gaming machine"**

Claim 1 of the '215 Patent and Claim 1 of the '603 Patent begin with the phrase "[i]n a network of gaming machines," and the phrase "gaming machine" appears frequently in the claims of both patents.  '215 Patent at 8:45; '603 Patent at 8:8.  The parties propose the following constructions of "gaming machines":

| Term or Language Requiring Construction | Aristocrat's Proposed Construction | IGT's Proposed Construction |
|---|---|---|

| "gaming machine" | gaming device (i.e., not limited to any particular type of game such as poker) | poker machine |
|---|---|---|

IGT relies for its construction on a sentence in the introductory paragraph in each patent which states: "[t]he present invention relates to apparatus for use with a system of linked poker machines and in particular the apparatus provides an improved jackpot mechanism for use with such a poker machine system." '215 Patent at 1:6-9; '603 Patent at 1:9-12.  IGT contends that this statement defines the invention and that "the public is entitled to take the patentee at his word and the word was that the invention" is a poker machine.  *Honeywell Int'l, Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (holding "fuel injection system component" was limited to "fuel filter" because the written description called "the present invention" a fuel filter).  In *Honeywell*, the court wrote that, although the prosecution history contained some suggestion that the invention, a "fuel injection system component," was broader than only fuel filters, "the entire specification of [the patent], as well as the sole drawing, describe the elements and operation of a fuel filter . . . . No other parts are described." *Id.* at 1316 (quoting district court order in *Honeywell Int'l v. ITT Indus.*, 330 F.Supp.2d 865, 879 (E.D.Mich. 2004)).  As a result, the court held that the invention was limited to a fuel filter.  *Id.* at 1318.

The patents here refer to "poker" only in their introductory paragraphs.  The specifications include descriptions of "gaming machines" and the language strongly suggests that the term "gaming machine" should not be limited to a "poker machine."  For instance, the patents state in their "Detailed Description of the Preferred Embodiments" sections:

> Feature jackpots in this format exhibit significant differences over previous jackpot systems:
> (i) A jackpot game is provided which is compatible with any existing game combination within an installation independent of the platform, denomination or type of game (e.g. slot machines, cards, keno, bingo or pachinko).  This will allow for the linking of games combinations between game type, platform type, and denomination."

'215 Patent at 5:19-26; '603 Patent at 4:47-53.  In addition to the reference to multiple types of games, the context of the statement is important.  It describes some of the advantages of using a "spin and hold"-type feature game over "conventional combination-triggered jackpots."  In a spin

United States District Court
For the Northern District of California

and hold type game, a set of reels spin and, when the player stops the reels by pressing a button, the feature-prize score is determined by the sum of the points that appear on the center line of those reels. '215 Patent at 5:15-19; '603 Patent at 4:42-46, 7:12-18; *See also id.* at Fig. 3 (depicting set of five reels). A "combination triggered" jackpot, by contrast, awards a jackpot upon the occurrence of a particular game configuration (e.g., a certain combination of symbols). '215 Patent at 1:52-55; 2:26-29; '603 Patent at 1:56-60; 2:30-34. According to the specification, using a spin and hold feature game has the advantage of being usable with different types of main games. *See* '215 Patent at 5:21-25; '603 Patent at 4:47-58. In light of this claimed advantage in the preferred embodiments, limiting "game machine" to "poker machine" is not supported by the specification. The court therefore construes "gaming machine" as "gaming device which is not limited to any particular type of game such as poker."

### 2. "Progressive prize"

Both patents claim "a method of awarding one progressive prize from a plurality of progressive prizes . . . ." '215 Patent at 8:49-51; '603 Patent at 8:10-11. The specification does not define "progressive prize", but the plain meaning of "progressive" and the disclosure in the specification suggest that the prize increases according to some criteria. The '215 Patent abstract, for example, states that "the jackpot controller is arranged to receive each of the machine operation signals and to increment the value of a random jackpot prize on the occurrence of each of these operation signals." The parties agree that the prize should be increased based on some criteria, but disagree as to whether the prize must be paid from a "pool." The parties propose the following constructions of "progressive prize":

| Term or Language Requiring Construction | Aristocrat's Proposed Construction | IGT's Proposed Construction |
|---|---|---|
| "progressive prize" | a prize that increases based on some criteria (i.e., time, games played, marketing money, coin in/out, etc.). | a prize paid from a pool that increases based on some criteria. |

IGT points to the following language from the "Summary of the Invention" where the patent describes a "fifth aspect" of the invention:

United States District Court
For the Northern District of California

> such that the progressive feature jackpot is implemented using a central feature jackpot system connected to the network to provide an incrementing jackpot pool which increases in response to signals from the connected consoles, and the feature jackpot game on each machine awards a jackpot drawn from the jackpot pool.

'215 Patent at 3:19-24. The preferred embodiments also use the term "pool" to describe the jackpot system, stating that "the machine contributions go into the prize pool as with known prior art jackpot systems, while the overhead display shows the incrementing prize value." *Id.* at 5:64-67; '603 Patent at 5:24-27.  Finally, IGT offers the testimony of Scott Olive ("Olive"), the inventor, that a progressive jackpot, understood by one skilled in the art, uses a system of networked gaming machines that share the same bonus pool.  Def.'s Claim Construction Brief 3:7-14 (hereinafter "IGT CC").  Olive gives an example top prize, called a "Grand Progressive" which was a "fixed prize" of $50,000 or two motorbikes.  *Id.*  Aristocrat responds that the claims themselves nowhere require that the prize come from a pool, and that Claim 1's requirement that the machine award "one progressive prize from a plurality of progressive prizes" indicates that the progressive prize need not come from a pool.  Pls.' Reply Claim Construction Brief 5 (hereinafter "Reply CC").

The parties seem to have different understandings of the term "pool."  In including "pool" in its construction, IGT seems to require that the prize amount is paid into by each of the networked machines and can also be paid out to any of them.  Aristocrat, on the other hand, appears to suggest that a pool has contents of similar type (and therefore, according to Aristocrat, a plurality of progressive prizes, some of which may be supplemented by other sources, are not in a "pool").  The abstract of the '215 Patent supports what appears to be IGT's construction:

> Each of the electronic gaming machines are provided with a network interface arranged to provide a signal onto the network on each occurrence of an operation of a respective machine and the jackpot controller is arranged to receive each of the machine operation signals and to increment the value of a random jackpot prize on the occurrence of each of these operation signals.

'215 Patent abstract.  In fact, the reason the gaming machines are networked appears primarily to be to allow the prize to be increased by operation signals from each machine, and to be paid out to any of the networked machines.  The court finds that the term "pool" relates to but inadequately captures this idea.  Therefore, the court construes the term "progressive prize" to mean "a prize amount or value that increases based, at least in part, upon contributions from networked gaming machines."

**United States District Court**
For the Northern District of California

### 3.     "Game"

IGT's contends that the term "game" is indefinite, rendering the claim invalid.  *See infra.*
Arguing in the alternative, IGT proposes that the term "game" be construed in the following way.
Aristocrat submits that the term needs no further construction.

| Term or Language Requiring Construction | Aristocrat's Proposed Construction | IGT's Proposed Construction |
| --- | --- | --- |
| "game" | game | In the context of these claims, this term is indefinite and provides no clear criteria to distinguish between what is a first game and what is a second game.<br><br>At the time, a person of ordinary skill would have understood the term to mean: A gambling activity played according to a set of rules.  A game does not require user interaction.  A game has a distinct beginning and ending.  A game begins when a player irrevocably commits a wager that is not part of any previous game.  A game ends when all transactions for the game have finished, including the loss or return of the wager and award of all prizes won.  Second screen bonus features, free plays and the like are not separate games. |

IGT contends that "game" is a term of art with a technical meaning to those skilled in the art.
Because, according to IGT, the specification gives insufficient guidance as to the meaning of the
term "game," the court should look to industry regulations to determine an appropriate construction.
IGT CC at 5.  IGT's lengthy construction is composed largely of limitations culled from a variety of
gaming regulations.  *Id.*  Australian regulations define a "game" as "a gambling activity played
according to a set of rules."  IGT CC at 6 (citing *Australia/New Zealand Gaming Machine National
Standards*, Rev. 1.0 §§ 3.264-65 at 3-42 (1997), attached to Irvine Decl. at Ex. L).  Nevada gaming
regulations require that "gaming devices" have the capacity to display complete play histories of the

United States District Court
For the Northern District of California

nine games immediately preceding the most recent one. *Id.* (citing *State of Nevada, Regulations of the Nevada Gaming Commission and State Gaming Control Board: Technical Standards for Gaming Devices*, § 1.080(7)(November 1997), attached to Irvine Decl. at Ex. O). And Australian/New Zealand gaming regulations also provide that games begin and end with a wager and either loss or payment, respectively. *Australia/New Zealand Gaming Machine National Standards*, Rev. 1.0 §§ 3.264-65 at 3-43. Finally, the standards promulgated by Gaming Laboratories International, called the *GLI-11: Gaming Devices in Casinos*,[1] define "second screen bonus features, or free plays, as all part of a single game, and not as separate games." IGT CC at 6 (*citing Gaming Laboratories International, GLI-11: Gaming Devices in Casinos*, Ver. 1.4 § 4.2.4 at 66 (June 30, 2006), attached to Irvine Decl. at Ex. N.).

These limitations do not appear in the specification. Rather, the specification distinguishes "games" broadly by type of game (e.g., slot machines, cards, keno, bingo, or pachinko) ('215 Patent at 5:23-24; '603 Patent at 4:49-53), and by the different prizes available from the game (a "jackpot feature game" is played for a jackpot prize (*see* '215 Patent at 6:23-28), whereas a "main game" would likely award smaller "combination-triggered" prizes (*see id.* at 1:64-2:2)). The court finds that the term "game" as used in the specification and claims is meant to encompass a wide variety of game types. Indeed, the specification describes flexibility in game type and jackpot award as advantages over a single-game arrangement. *See id.* at 5:20-30, 43-45 ("Jackpot hit rates can now be changed without making changes to the base game. This was previously not possible using combination triggered jackpots.") The court finds that limiting games to gambling activities played according to a set of rules is appropriate since the subject matter of the payment relates both to gambling and games. Further limitation is not necessary. Accordingly, the court construes the term generally, that is "a gambling activity played according to a set of rules."

### 4.     "Using a second game to select said one progressive prize"

---

[1]  According to IGT's brief: "Like a restatement or uniform act in the law, the GLI-11 is an industry standard having widespread acceptance and setting forth the industry usage of "game" and "completion" of a "game." IGT CC at 6 n. 4.

1       Aristocrat and IGT agree that the preamble language "using a second game to select said one

2   progressive prize" ('215 Patent at 8:50-51; '603 Patent at 8:12) requires no further construction, but

3   disagree as to whether it constitutes a claim limitation.  IGT argues that the language appears in the

4   preamble, and thus is not a limitation because it is not "necessary to give life, meaning, and vitality

5   to the claim."  *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1373 (Fed.

6   Cir. 2001).  But a preamble term can limit the invention if it "recites an essential structure or steps,"

7   *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002), or if the

8   terms can only be understood in the context of the preamble.  *Pitney Bowes, Inc. v. Hewlett-Packard

9   Co.*, 182 F.3d 1298, 1305-6 (Fed. Cir. 1999).  But a  preamble is not limiting, for example, "where a

10  patentee defines a structurally complete invention in the claim body and uses the preamble only to

11  state a purpose or intended use for the invention."  *Catalina Marketing*, 289 F.3d at 808.

12      *Pitney Bowes* concerned the construction of terms in the preamble of a patent entitled

13  "Apparatus and Method for Generating Images by Producing Light Spots of Different Sizes," which

14  related to the technology of laser printing.  *Pitney Bowes*, 182 F.3d at 1301.  The court found that the

15  claim reference to "generated shapes" could only be understood in the context of the preamble

16  language "producing on a photoreceptor an image of generated shapes made up of spots." *Id.* at

17  1306.  Therefore, the court construed the preamble and the remainder of the claim as "one unified

18  and internally consistent recitation of the claimed invention." *Id.*

19      In this case the preamble of Claim 1 of each patent recites the step of "using a second game

20  to select said one progressive prize."  '215 Patent at 50-51; '603 Patent at 8:12.  Although the

21  remainder of the claim recites selecting one progressive prize, it does not specifically say the second

22  game is used to make the selection.  *See* '215 Patent at 9:10-25 ("triggering . . . randomly selecting . .

23  . displaying . . . activating . . . identifying . . . awarding . . . .").  These steps are only understandable

24  in the context of the process they describe: "using a second game to select said one progressive

25  prize."  Further, the preamble refers to the game machines as having a "user interface" and the

26  remainder of the claim refers back to the preamble's description when it recites the step of

27  "activating said user interface."  *Id.* at 8:46, 9:18.  Therefore, the court finds that the preamble

28  constitutes a claim limitation.

United States District Court
For the Northern District of California

### 5. "Causing a second game trigger condition to occur as a result of first main game being initiated"

The parties dispute whether the second game trigger condition must necessarily occur as a result of the first main game being initiated. The parties propose the following constructions:

| Term or Language Requiring Construction | Aristocrat's Proposed Construction | IGT's Proposed Construction |
|---|---|---|
| "causing a second game trigger condition to occur as a result of said first main game being initiated" | Causing a trigger condition for a second game to occur as a result of the first main game being initiated.<br><br>A second game trigger condition can occur as a result of testing of a trigger condition in software. | Satisfying the second game trigger condition by initiating the first main game. Initiating the first main game is sufficient to, and always does, satisfy the second game trigger condition |

The claim language under dispute is immediately followed by: "said second game trigger condition occurring randomly and having a probability of occurrence dependent on the amount of the wager made at the particular gaming machine . . . ." '215 Patent at 8:60-64; '603 Patent at 8:22-25. This language makes clear that the main game's initiation does not *always* satisfy the second game trigger condition; rather, it happens according to a specified probability. Nonetheless, IGT contends that its construction of the disputed language is the correct one because, first, it comports with the plain meaning of the language, and second, prosecution-history amendments preclude adopting Aristocrat's proposed construction.

Although the disputed language, in isolation, might be read to require that initiation of the first main game always satisfies the second game trigger condition, the language that follows puts the disputed language in proper context. Claim construction takes the context in which the disputed term appears into account. *Pause Technology, LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005)(improper to ignore later language appearing in the claim). In fact, the claim itself effectively defines "causing a second game trigger condition" in the same limitation stating, "said step of causing the second game trigger condition including . . . (1) selecting . . . (2) allotting . . . (3) indicating . . . ." '215 Patent at 8:64-9:9; '603 Patent at 8:26–34. The probability calculation that

United States District Court
For the Northern District of California

potentially produces the second game is described in the specification. The "Summary of the Invention" states:

> According to a second aspect, the present invention provides a random prize awarding system associated with a network of gaming consoles, the system being arranged to offer a feature outcome on a particular console when a trigger condition occurs as a result of a game being played on the respective console[,] the prize awarding system including trigger means arranged to test for a trigger condition and to initiate the feature outcome on the respective console when the trigger condition occurs, the trigger condition being determined by an event having a probability related to credits bet per game on the respective console.

'215 Patent 2:42-52. The clear meaning of the language in question, construed in the context of the claim, supports Aristocrat's construction.

IGT also contends that amendments made during prosecution foreclose Aristocrat's proposed construction. During prosecution, Aristocrat's patent counsel deleted the term "determining the trigger condition of the first game being initiated" and replaced it with "causing a second game trigger condition." Irvine Decl. Ex. G at 3. This amendment was one of a number of amendments and did not produce the final claim language. The remarks included with the amendment distinguish prior art, which the examiner found invalidating on obviousness grounds, on the basis that the prior art did not describe or suggest: 1) a plurality of prizes from which one is chosen; 2) choosing the one prize through a second game; and 3) that a second game occurs after the completion of the first game. *See id.* at 10-11. The amendment did not relate to whether the trigger condition necessarily followed from the initiation of the first main game. Later in the remarks, patent counsel states that, in relation to then-claim 110: "Claim 110 further defines the step of causing a second game trigger condition to occur to include . . . . " *Id.* at 12. IGT's argument that Aristocrat is barred by its prosecution amendment is without merit.

The court concludes that initiating the first main game does not always cause a trigger of the second game to occur. If a second game is triggered, it, of course, is triggered by initiation of the first game. "Causing a second trigger condition to occur as a result of said main game being initiated" needs no interpretation.

**6.    "Said step of causing the second game trigger condition to occur including: (1) selecting . . . (2) allotting . . . (3) indicating . . . ."**

IGT contends that the language **"said step of causing the second game trigger condition to occur including: (1) selecting . . . (2) allotting . . . (3) indicating . . . ."** ('603 Patent at 25-34; '215 Patent at 8:59-9:9) requires that the numbered steps be performed in the order they appear.  IGT CC at 11.  Aristocrat responds that the "selecting" and "allotting" steps need not be performed in the stated order.  The parties propose the following constructions:

| Term or Language Requiring Construction | Aristocrat's Proposed Construction | IGT's Proposed Construction |
|---|---|---|
| Said step of causing the second game trigger condition to occur including: (1) selecting . . . (2) allotting . . . (3) indicating . . . ." | No requirement for enumerated order | Each of the three steps enumerated in the "causing" step (that is (1) selecting . . . (2) allotting . . . (3) indicating . . .) must be performed in the enumerated order each time the main game is initiated. |

To determine whether the steps of a method claim must be performed in the order in which they are recited, the court looks first to whether, as a matter of logic or grammar, the steps must be performed in the order written.  *Altiris v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003).  If not, the court looks second to whether the specification "directly or implicitly requires such a narrow construction."  *Id.* at 1370.

The language of the claim, besides using numerals before each component of the "causing . . ." step, does not require any particular order of performance.  The use of "including" does not suggest that the following actions are performed in the order stated.  IGT argues that because (1) introduces "a predetermined range of numbers" from which the plurality of numbers in (2) is allotted, (1) must come before (2).  IGT CC at 12.  The court agrees with Aristocrat that the occurrence of "a predetermined range of numbers" in (1) is merely an artifact of how the claim was drafted, and is not enough to require performance in the stated order.

However, the logic of the enumerated actions does imply some order.  The final action, "indicating the occurrence of the second game trigger condition if one of the *allotted* numbers matches the *selected* random number" cannot be performed until a random number has been selected and a plurality of numbers allotted to the player.  *See* '215 Patent at 9:7-9 (emphasis added).  Aristocrat appears to concede that the indicating step must be performed last.  *See* Reply CC at 9.

Turning to the specification, IGT argues that the flowcharts in both patents demonstrate that the selection step should precede the allotting step.  *See* '215 Patent at Fig. 2; '603 Patent at Fig. 2. The flowchart does indeed order the selecting step (numbered 21) before the allotting one (numbered 23).  *Id.*  But the flowchart, and the rest of the specification, do not "directly or implicitly require" that the steps ordered as shown should constitute a claim limitation.  The claim, read in light of the specification, requires only that the third step come last.  Because this is evident from the language of the disputed term, the court agrees that no further construction is necessary.

### 7.   "Allotting a plurality of numbers from the predetermined range of numbers"

The parties disagree as to what "allotting a plurality of numbers from the predetermined range of numbers" means.  They propose the following interpretations:

| Term or Language Requiring Construction | Aristocrat's Proposed Construction | IGT's Proposed Construction |
| --- | --- | --- |
| "allotting a plurality of numbers from the predetermined range of numbers" | Giving to the player a plurality of numbers from a range of numbers determined in advance.<br><br>In the case of a computer implementation of the method, the term "predetermined" can include "programmed" as in computer programming. | Selecting and assigning two or more numbers from the entire predetermined range of numbers.  Each number within the predetermined range must be available for selection and assignment.  This excludes selecting and assigning only one single number.<br><br>The predetermined range of numbers is a range of numbers that is determined before making a wager and before initiating the first main game. |

### a.   "Allotting a Plurality of Numbers"

The '215 Patent describes two possible ways of determining whether the feature game trigger condition has been satisfied.  In both embodiments, a single random number is selected from within a range.  In the first embodiment, a game is allotted a set of numbers within that range.  '215 Patent at 6:18-23; '603 Patent at 51-65.  The size of that set of numbers (that is, the number of allotted numbers) is equal to the number of credits the player has bet.  '215 Patent at 6:18-23; '603 Patent at 51-65.  The trigger condition is satisfied when the random number matches one of the numbers in

ORDER STRIKING PORTIONS OF CREVELT'S DECLARATION, CONSTRUING CLAIMS OF UNITED STATES PATENT NOS. 7,056,215 AND 7,108,603, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INDEFINITENESS
C-06-03717 RMW
JAS

15

the allotted set.  '215 Patent at 6:18-23; '603 Patent at 51-65.  In the second embodiment, the game is allotted a single number corresponding to the number of credits bet.  '215 Patent at 6:27-37; '603 Patent at 55-60.  If, within the range of numbers, the randomly selected number is less than the single allotted number (called the "player value"), the feature-game trigger condition is satisfied.  '215 Patent at 6:27-37; '603 Patent at 55-60.  At issue is whether, as described in the second embodiment, the allotting of a single number is foreclosed by the claim's requirement that a "plurality of numbers" be allotted.

"Plurality" means at least two.  *York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996).  Neither party disagrees.  The dispute is whether "allotting a plurality of numbers" includes allocating "a single number" which is equal to, or proportional to, the number of credits bet and the trigger value is compared with the "single player value" and a jackpot feature awarded if the trigger value is less than or equal to the player value.  '215 Patent at 6:28-32; '603 Patent at 5:58-60.  Aristocrat contends that the single number or single player value referred to in the specification is a plurality of numbers because it represents the number and all those numbers less than the number.  Aristocrat further points out that IGT's interpretation would exclude coverage of the alternative embodiment of the patent and that a claim interpretation that excludes a preferred embodiment "is rarely, if ever, correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

IGT points out, however, that the claim language expressly states "allotting a plurality of numbers" and the description of the alternative embodiment in the specification expressly says *"a number* is allocated" and refers to "the range of numbers below *the allotted number.*" IGT CC at 16 (quoting '215 Patent at 6:18-23 (emphasis added)).  Therefore, argues IGT, the claim language cannot include the alternative embodiment.  The court disagrees.  If Claim 1 of the '215 Patent is read in the context of the specification as a whole, the allocation of a number representing a range of numbers falls within the coverage of "allotting a plurality of numbers."

IGT also argues that Aristocrat gave up coverage of the alternative embodiment during prosecution to get around prior art and that Aristocrat abandoned claims that would have read on the alternative embodiment.  Neither argument has merit.  Nothing Aristocrat said during prosecution

ORDER  STRIKING PORTIONS OF CREVELT'S DECLARATION, CONSTRUING CLAIMS OF UNITED STATES PATENT NOS. 7,056,215 AND 7,108,603, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INDEFINITENESS
C-06-03717 RMW
JAS

16

gave up a claim that involved allocating one number (e.g., 20) to represent a pluarality of numbers (e.g., 1-20) nor does it appear that Aristocrat intentionally narrowed its claims. *See SuperGuide Corp. v. DirectTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). Under the alternative embodiment, then, each of the numbers below the player value are "allotted" to the player. The embodiment is therefore covered by the claim language.

### b. "Predetermined Range of Numbers"

IGT contends that Aristocrat defined, in the prosecution history, "predetermined range of numbers" as a range of numbers determined before the beginning of the game. IGT CC at 18. IGT points to a prosecution-history document which distinguishes two pieces of prior art, the "Surprise Software Specification," and the "Torango '460 Patent" because "the range of the random number generator in the pending claims does not change during game play." Irvine Decl. Ex. D at 3. The specification supports this reading. The abstract of the '215 Patent states that the range is selected "prior to each game" and the flowchart in Fig. 2 refers to the range as "predetermined" in the first step. Aristocrat responds that the claims do not support this construction of "predetermined range" and that a person of skill in the art would understand the term otherwise. Pls.' Claim Construction Brief 13 (hereinafter "Aristocrat CC"). The court finds that the Aristocrat's statements in the prosecution history constitute a "clear disavowal of claim coverage." *SuperGuide*, 358 F.3d at 875. The predetermined range of numbers must therefore be determined before the beginning of the main game.

### c. Must Each Number in the Predetermined Range Be Available for Allotment?

IGT also proposes that the claim requires that "each number within the predetermined range must be available for selection and assignment." Aristocrat responds that this means, "[i]n other words, if a particular IGT machine one[-]dollar machine had a 100,000 range of possible numbers from which numbers could be given to the player based on his or her bet size, but the particular slot machine, not surprisingly, did not accept $100,000 wagers, the IGT machine would not infringe." Aristocrat CC at 13. IGT does not respond in its claim construction brief, and the court agrees that the limitation has no basis in the claim language.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

#### d. Construction of Language

The court construes the language at issue as "giving to the player two or more numbers from a range of numbers. The range of numbers must be determined before the beginning of the first main game. Each number in the predetermined range need not be available for allotment."

### 8. "Indicating the occurrence of the second game trigger condition if one of the allotted numbers matches the selected random number"

Aristocrat and IGT have two disputes over the construction of the limiting language "indicating the occurrence of the second game trigger condition if one of the allotted numbers matches the selected random number." First, the parties disagree as to whether two numbers can "match" when one is less than the other. Second, they dispute whether "indicating the occurrence" of the second game trigger condition must be displayed to the user, and when that indication must occur. The parties propose the following constructions:

| Term or Language Requiring Construction | Aristocrat's Proposed Construction | IGT's Proposed Construction |
|---|---|---|
| indicating the occurrence of the second game trigger condition if one of the allotted numbers matches the selected random number" | indicating the occurrence of the second game trigger condition if one of the allotted numbers matches the selected random number | If one of the allotted numbers is identical to the selected random number, alerting the player during the first main game that a second game will appear after the first game is complete. This indication is different from and precedes the appearance and display of the second game. |

#### a. "match"

IGT contends that one of the allotted numbers has to be identical to the selected random number in order for an indication of the second game trigger condition to occur. In other words, the numbers have to be identical. Since the court has construed "allotting a plurality of numbers" to include allotting the numbers represented by the player value, the dispute regarding the term "match" has little significance. Accordingly, even if the court were here to adopt IGT's construction, the embodiment at issue would still be covered by the claim language under the court's above construction.

Nonetheless, Aristocrat's contention that "match" does not mean "identical" based upon a dictionary definition of "match" as "a suitable pairing of persons or objects" is not persuasive. Reply CC at 14 (citing MERRIAM WEBSTER'S DICTIONARY, 334 (1995)). Numbers do not "match" in the same way as a shirt and jacket might. In the context of the claimed invention, it would be nonsensical to say that two numbers "matched" merely because they were "suitably paired." The court therefore concludes that two numbers "match" under the claim language when they are "identical."

### b. "indicating the occurrence of the second game trigger condition"

IGT also argues that "indicating the occurrence of the second game trigger condition" cannot be an internal action within the software. IGT CC at 21. That is, the occurrence of the trigger condition must be indicated to the player. IGT cites a section of the specification which describes how the player is notified when the second-game trigger condition is satisfied:

> Preferably, when a jackpot game is triggered, all players are alerted by a jackpot bell that a possible grand jackpot is about to be played for. This is done so that all players share in the experience of a jackpot win. Anecdotal evidence of players watching feature games being played in Australian casinos suggests that the drawing power of such games is immense.
> Players are alerted by the jackpot bell instantaneously at any point during a game, but the feature game at will not appear until the current game (including base game features) are completed.

'215 Patent at 7:41-51. Aristocrat responds by citing the "Summary of the Invention" section of the specification which states that the "function of triggering a feature jackpot game may either be performed by a central feature game controller or may be performed within each console in the system." *Id.* at 4:4-7.

The portion of the specification cited by Aristocrat deals with whether the triggering calculation is done centrally in the game-machine network, or on the particular machine. It does not suggest that the occurrence of the second game trigger is not indicated to the player. On the other hand, the section of the specification that IGT cites from the preferred embodiments explains the purpose of indicating the occurrence of the second game trigger—attracting the attention of players. Therefore, it follows that the "indicating the occurrence" as used in the claim means indicating to the player.

United States District Court
For the Northern District of California

### 9.    "After completion of said first main game"

The parties propose the following constructions of the phrase "after completion of said first main game":

| Term or Language Requiring Construction | Aristocrat's Proposed Construction | IGT's Proposed Construction |
|---|---|---|
| "after completion of said first main game" | after completion of the first main game. | after all transactions for the first main game have finished, including the loss or return of the wager and award of all the prizes won |

IGT asserts that a person of ordinary skill in the art would understand from gaming-industry regulations that a game was "complete" when "all transactions have finished, including the loss or return of the wager and award of all prizes won." IGT CC at 23 (citing Irvine Decl. Exs. N, M, L). As Aristocrat points out, extrinsic evidence may not be used to vary or contradict the manifest meaning of the claims. *See Vitronics Corp. v. Conceptronic, Inc.*, 80 F.3d 1576, 1585 (Fed. Cir. 1996). Here, the specification and claims state that the second game's purpose is to determine the award of the "one progressive prize from [the] plurality of progressive prizes." Because the award of the one progressive prize must occur after the feature game, it cannot be part of the first main game. "All prizes" are not awarded during the first main game as IGT's proposed construction appears to require. However, without construction the term does not clearly delineate between the first main game and a second feature game. Because the first main game can be of any type, some type-independent criteria is necessary to distinguish the first main game from any second feature game. The court therefore construes the term "after completion of the first main game" as "after the wager has been lost or a non-progressive prize has been awarded pursuant to the rules of the first main game."

### 10.    "Randomly selecting said one progressive prize from said plurality of progressive prizes that has been won"

IGT argues that the phrase "that has been won" in the phrase "randomly selecting said one progressive prize from said plurality of progressive prizes that has been won" refers to the "plurality of progressive prizes" and therefore requires that the player win at least two progressive prizes

before winning one of them again.  Aristocrat contends "that has been won" merely refers to one

progressive prize that has been won.

| Term or Language Requiring Construction | Aristocrat's Proposed Construction | IGT's Proposed Construction |
|---|---|---|
| "randomly selecting said one progressive prize from said plurality of progressive prizes that has been won" | randomly selecting one progressive prize from the plurality of progressive prizes that has been won. There is no requirement that two or more prizes be won or any temporal restriction | winning two or more progressive prizes and then selecting one of those two or more progressive prizes |

The specification and the claims nowhere contemplate the winning of multiple progressive

prizes in the main game, or any time before the second game.  Rather, the second game is directed

towards selecting the one progressive prize that the player has won.  Each step including the

disputed wording ("randomly selecting said one progressive prize . . .", "identifying to the player

said one progressive prize . . ." and "awarding said one progressive prize . . .") is each sensibly

construed as referring to the one progressive prize, selected by the second game, that the player has

won.  '215 Patent at 9:14-25.  The court therefore adopts the following construction: "randomly

selecting the one progressive prize that has been won from the number (at least two) of progressive

prizes available."

### C.   IGT's Motion for Summary Judgment on Indefiniteness

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed.

Cir. 1998).

Section 112 of the Patent Act requires that the claims "particularly point[] out and distinctly

claim[] the subject matter which the applicant regards as his invention."  35 U.S.C. § 112, ¶ 2.

Claim indefiniteness is a conclusion drawn from the court's construction of the claims, and is

therefore a question of law.  *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1378

(Fed. Cir. 1999); *Exxon Research and Engineering Co. v. U.S.*, 265 F.3d 1371, 1376 (Fed. Cir. 2001)

United States District Court
For the Northern District of California

1   (rejecting the argument that indefiniteness turns on an underlying factual issue that should not have

2   been resolved on summary judgment).  In considering whether a patent is indefinite, a court must

3   determine whether those skilled in the art would understand what is read in light of the specification.

4   *Bancorp Services, LLC v. Hartford Life Insurance Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004).

5          Still, a difficult issue of claim construction does not render a claim indefinite.  *Exxon*, 265

6   F.3d at 1375.  "If a claim is insolubly ambiguous, and no narrowing construction can properly be

7   adopted," then the claim is indefinite.  *Id.*  But if "the meaning of the claim is discernible, even

8   though the task may be formidable and the conclusion may be one over which reasonable persons

9   will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness

10  grounds." *Id.*  Finally, in light of the statutory presumption of patent validity, close questions of

11  indefiniteness are resolved in favor of the patentee.  *Id.* at 1380.

12         Aristocrat amended the claims during prosecution after they were rejected by the examiner as

13  obvious in view of Luciano, et al. (United States Patent No. 6,050,895) ("Luciano") and Torango

14  (United States Patent No. 6,592,460) ("Torango").  *See* IGT's Mot. Summ. J. 7, 8; Wichman Decl.

15  Ex. D-6, D-7.  In particular, IGT argues that the distinction between a "first main game" and a

16  "second game" was added to distinguish Torango, and that the limitation "after completion of the

17  first main game" was added to distinguish Luciano.  IGT contends that these amendments render the

18  patent invalid because they do not "reasonably apprise those skilled in the art" as to their scope.

19  *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.*, 927 F.2d 1200, 1217 (Fed. Cir. 1991).  As the court

20  wrote in *Amgen*, "when the meaning of claims is in doubt, especially when, as is the case here, there

21  is close prior art, they are properly declared invalid [for indefiniteness]."  *Id.* at 1218.

22         The extent to which § 112 requires claims to clearly distinguish prior art has been the subject

23  of a Federal Circuit case issued since briefing on summary judgment in this case completed.  In

24  *Young v. Lumenis*, 492 F.3d 1336, 1342 (Fed. Cir. 2007), the court considered whether the term

25  "near" was indefinite because it failed to distinguish prior art.  The district court in *Young* relied on

26  the above-quoted language in *Amgen*, and determined that "in light of [ ] strikingly similar prior art,

27  the Court does not see how . . . the patent adequately delineates the scope of the invention." *Id.* at

28

United States District Court
For the Northern District of California

1342-43.  The Federal Circuit reversed, concluding that *Amgen* did not support the district court's

decision.  *Id.* at 1347.  The court wrote:

> Unlike the situation in *Amgen*, here the intrinsic evidence does provide guidance on the meaning of the term "near."  When the intrinsic evidence resolves the claim construction, a term is not "insolubly ambiguous," and thus reference to the prior art is not needed. That is the situation here.  In addition, there were no office actions issued by the PTO during the original prosecution rejecting the claims over the prior art.  There were also no amendments or arguments filed by the patentee.  Thus, unlike in *Amgen*, the claims were not amended to include vague language in order to overcome close prior art.

*Id.*  If the specification is clear, then, no reference to the prior art is necessary.  If it is not, then the

prosecution history, amendments to distinguish prior art, and arguments offered to the PTO, are

properly considered as part of the indefiniteness inquiry.

Because the court finds, in the above claim construction, that the intrinsic evidence resolves

the claim construction as to the terms "game" and "after completion of said first main game," the

terms are not "insolubly ambiguous."  IGT's motion for summary judgment on indefiniteness is

therefore denied.

### III.  ORDER

For the reasons stated above, the court:

1.   Strikes paragraphs 7, 10, 16, 19 and 21 of the declaration of Dwight Crevelt in support of

Aristocrat's Claim Construction Brief;

2.   Denies IGT's motion for summary judgment that the '215 Patent and the '603 Patent are

invalid; and

3. Construes the disputed claim language as follows:

| Disputed Language | Court's Construction |
|---|---|
| "gaming machine" | gaming device which is not limited to any particular type of game such as poker |
| "progressive prize" | a prize amount or value that increases based, at least in part, upon contributions from networked gaming machines. |
| "game" | a gambling activity played according to a set of rules |
| "using a second game to select said one progressive prize" | claim limitation in preamble |

**United States District Court**
For the Northern District of California

| "causing a second game trigger condition to occur as a result of first main game being initiated" | No construction required |
|---|---|
| "said step of causing the second game trigger condition to occur including: (1) selecting . . . (2) allotting . . . (3) indicating . . ." | No construction required |
| "allotting a plurality of numbers from the predetermined range of numbers" | giving to the player two or more numbers from a range of numbers. The range of numbers must be determined before the beginning of the first main game. Each number in the predetermined range need not be available for allotment |
| "indicating the occurrence of the second game trigger condition if one of the allotted numbers matches the selected random number" | If one of the allotted numbers is identical to the selected random number, alerting the player during the first main game that a second game will appear after the first game is complete.  This indication is different from and precedes the appearance and display of the second game. |
| "after completion of said first main game" | after the wager has been lost or a non-progressive prize has been awarded pursuant to the rules of the first main game |
| "randomly selecting said one progressive prize from said plurality of progressive prizes that has been won." | randomly selecting the one progressive prize that has been won from the number (at least two) of progressive prizes available |

DATED:      05/14/09

*Ronald M Whyte*

RONALD M. WHYTE
United States District Judge

United States District Court
For the Northern District of California

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

Anthony R. de Alcaeus        adealcuaz@mwe.com
Terrence Patrick McMahon     tmcmahon@mwe.com
Robert J. Blanch , Jr.       rblanch@mwe.com

**Counsel for Defendants:**

Jeffrey Stewart Love         jeffrey.love@klarquist.com
Adam Randal Wichman          adam.wichman@klarquist.com
Gabriel M. Ramsey            gramsey@orrick.com
Garth Alan Winn              garth.winn@klarquist.com
Kristin L. Cleveland         kristin.cleveland@klarquist.com
Lane M Chitwood              lane.chitwood@klarquist.com
Patrick Marshall Bible       patrick.bible@klarquist.com
Robert T. Cruzen             rob.cruzen@klarquist.com
Samir N. Pandya              samir.pandya@klarquist.com
Stephanie Sue Irvine         stephanie.irvine@klarquist.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**    05/14/09                              JAS
                                          **Chambers of Judge Whyte**