1

2

3                                                           **E-FILED on**   5/6/2011

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                         SAN JOSE DIVISION

11

12  ARISTOCRAT TECHNOLOGIES,          No. C-06-003717
     AUSTRALIA PTY LIMITED and

13  ARISTOCRAT TECHNOLOGIES, INC.,     FINDINGS OF FACT AND CONCLUSIONS
                                    OF LAW (Claim of Inequitable Conduct with

14           Plaintiffs,               Respect to Petition to Revive Abandoned
                                      Patent Application)

15         v.

16  INTERNATIONAL GAME TECHNOLOGY
     and IGT,

17

18           Defendants.

19

20

21       On June 15, 2010 the court stayed further district court proceedings in this case except for

22  proceedings on the claim of International Game Technology and IGT (collectively "IGT") that

23  Aristocrat Technologies, Australia Pty Limited, and Aristocrat Technologies, Inc. (collectively

24  "Aristocrat") committed inequitable conduct in the revival of abandoned United States Patent

25  Application No. 09/462,717 ("'717 application").  That application, after revival, was successfully

26  prosecuted resulting in the issuance of United States Patent No. 7,056,215 ("'215 patent").  IGT's

27  inequitable conduct claim focuses on the alleged falsity of the statement that "[t]he entire delay in

28  filing the required reply until the filing of a grantable petition under 37 CFR 1.137(b) was

United States District Court
For the Northern District of California

1   unintentional" made by Aristocrat's attorney in Aristocrat's petition to the Patent and Trademark

2   Office ("PTO") to revive the '717 application.  The court heard the case beginning on April 4, 2011

3   and ending on April 7, 2011 when it was submitted for decision.  After considering all the evidence

4   offered and the arguments of counsel, the court finds that IGT has not shown by clear and

5   convincing evidence that Aristocrat committed inequitable conduct rendering the '215 family of

6   patents unenforceable.  The court now sets forth its Findings of Fact and Conclusions of Law.

## I.  Findings of Fact

### A.  The Parties

7   1.  Plaintiff and counter-defendant Aristocrat provides a range of gaming solutions such as

10  software, systems, and hardware, including electronic gaming machines.  First Amended Complaint

11  ("FAC") ¶ 1.

12  2.  Defendant and counter-plaintiff IGT designs and manufactures electronic gaming

13  machines.  Def.'s Ans. ¶ 5.

### B.  Late Filing of the '717 Application

15  3.  During the late 1990s and early 2000s, Aristocrat worked with an Australian patent firm,

16  FB Rice & Co. ("FB Rice") to prosecute its patent applications worldwide.  (Stipulated).

17  4.  Chris Owens of FB Rice was one of the partners who worked on Aristocrat's patent

18  applications.  (Stipulated).

19  5.  On July 8, 1997 and September 9, 1997, Aristocrat filed in Australia provisional patent

20  applications PO 7780 and PO 9090, respectively.  Dkt. No. 339 ¶¶ 1-2.  One year later, on July 8,

21  1998, Aristocrat filed in Australia, under the Patent Cooperation Treaty ("PCT"), an international

22  application ("PCT Application") claiming priority to the above-referenced provisional applications.

23  *Id.* at ¶¶ 3-4.  The July 8, 1998 international PCT Application ultimately issued in the United States

24  in 2006 as the '215 patent.  Tr. Exh. 153.

25  6.  Several PCT deadlines are based on a PCT Application's earliest claimed priority date

26  (regardless of whether or not it is later held to be entitled to that date).  (Stipulated).  First, PCT

27  Applications are published, by rule, after 18 months from the earliest claimed priority date.  *See* PCT

28

United States District Court
For the Northern District of California

Article 21 ¶ (2)(a).  The earliest application to which Aristocrat's PCT Application claimed priority is the provisional Australian application filed on July 8, 1997 (PO 7780).  *See* '215 patent at pg. 1.

7.  Second, the U.S. "national fee" is due no later than 30 months from that date.  *See* 35 U.S.C. § 371.  Because January 8, 2000 fell on a Saturday, Aristocrat had until Monday January 10, 2000 to timely enter the national stage.  35 U.S.C.  §  21 (b).

8.  On December 30, 1999, Mr. Owens instructed Shahan Islam, a United States patent attorney then of the Friedman Siegelbaum law firm, to enter the national stage for the PCT Application in the United States by filing an application with the PTO.  Tr. Exh. 8.

9.  Pursuant to United States patent law and the Patent Office's Rules and Manual of Patent Examining Procedure[1] ("MPEP"), the filing date for payment of the national fee to enter the national stage in the United States is the date on which the Patent Office actually receives the fee, with one exception.  If the national fee is paid using the U.S. Postal Service's ("USPS") Express Mail Post Office to Addressee service in compliance with the requirement spelled out in 35 U.S.C. § 21(a), 37 CFR 1.6(a)(2) and 1.10(a)(1) and (2), and MPEP 513, the filing date of the fee is the date entered by the USPS as the "date-in" in the Express Mail label on the envelope in which the fee was mailed.

10.  Mr. Islam mailed the necessary documents to commence the national stage of the United States patent application via the USPS Express Mail.  Tr. Exh. 30.

11.  One day after the deadline expired, on January 11, 2000, the PTO received the national fee for the U.S. national stage of Aristocrat's PCT Application.  Tr. Exh. 35.

12.  The PTO assigned Application No. 09/462,717 ("the '717 application") to Aristocrat's PCT Application.  The '717 application was given a filing date of January 11, 2000.  *Id.*

13.  In a letter dated January 13, 2000, Mr. Owens was notified by Mr. Islam that the papers necessary to enter the national stage had been filed in the PTO on January 10, 2000.   Tr. Exh. 10.

---

[1]  All citations to the MPEP, unless otherwise noted, are to the 8th edition, August 2001.

United States District Court
For the Northern District of California

### C.  Islam's Actions Following Receipt of Notice of Missing Parts

14.  On March 21, 2000, the PTO mailed a Notice of Missing Requirements under 35 U.S.C. § 371, pointing out the items that had been received and those still required for acceptance under § 371.  Tr. Exh. 25.

15.  A Notice of Missing Requirements under 25 U.S.C. § 371 is not mailed in an application that the PTO recognizes as being abandoned.  Tr. Exh. 6 (MPEP 7th ed. at 1893.01(b)(1)).

16.  On April 6, 2000, Mr. Islam filed with the PTO a reply to the Notice of Missing Requirements, an information disclosure statement (IDS), a signed inventor and power of attorney form, and an assignment from named inventor Scott Olive to Aristocrat Leisure Industries Pty Ltd. Tr. Exh. 26.

17.  The April 6, 2000 reply included the inventor's declaration and power of attorney to several attorneys, including Mr. Islam (Reg. No. 32,507).  *Id.*

18.  The April 6, 2000 reply to the Notice of Missing Requirements prepared by Mr. Islam listed the date of the national stage commencement as January 10, 2000.  *Id.*

19.  In April 2000, Mr. Islam left the Friedman Siegelbaum firm because it was being disbanded.  (Stipulated).

20.  In April 2000, Mr. Islam joined the firm of Rosenman & Colin LLP.  (Stipulated).

21.  On April 19, 2000, Mr. Owens sent Cinzia Ascani of Aristocrat a letter reporting that the reply to the notice of missing parts was mailed to the PTO on April 6, 2000.  Tr. Exh. 31.

22.  On May 10, 2000, Mr. Islam sent a fax letter to Mr. Owens asking for prior art references for an information disclosure statement.  Tr. Exh. 32.

23.  On May 11, 2000, Irene Haberbusch (Mr. Owens' assistant) sent an email to Mr. Islam stating that Mr. Islam had already submitted prior art references to the PTO as part of an information disclosure statement.  Tr. Exh. 34.

24.  On June 13, 2000, the PCT Legal Office in the PTO mailed a Notice of Abandonment to Mr. Islam.  Tr. Exh. 35.

25.  The June 13, 2000 Notice of Abandonment was mailed to Mr. Islam at his former address at the now-disbanded firm of Friedman Siegelbaum.  *Id.*

26.  The Notice of Abandonment indicated that the '717 application was abandoned on January 11, 2000 for failure to pay the basic national fee within 30 months of the earliest priority date, or by January 10, 2000.  *Id.*

27.  Neither Aristocrat nor FB Rice was notified of the Notice of Abandonment at any time before Mr. Islam successfully submitted a petition to revive in July 2002.  *See* Tr. Exhs. 18, 31, 70, 99.

28.  On September 19, 2000, Mr. Islam filed a "Petition Under 37 CFR 1.10(c) or (d) to Correct 'Date-In' and Remove Notice of Abandonment" (the "Petition to Correct").  Tr. Exh. 38.

29.  The Petition to Correct contended that the papers were entitled to the Express Mail date of January 10, 2000.  *Id.*

30.  The Petition to Correct sought to satisfy Sections 1.10(c) and (d), which would have corrected the date and withdrawn the holding of abandonment, even though Mr. Islam was unable to satisfy Section 1.10(c) because he was not in possession of the Express Mail mailing label.  *Id.*

31.  In the absence of the mailing label, Mr. Islam submitted his client letter dated January 13, 2000 to the PTO to advocate the January 10, 2000 date of mailing via Express Mail, along with other evidence which he argued corroborated the date of mailing under Section 1.10(d).  *Id.*

32.  In the Petition to Correct, Mr. Islam expressed regret that he no longer was in possession of the Express Mail mailing label, as he had moved firms since the mailing and the file no longer contained the Express Mail mailing label, and he was unable to obtain a copy from the USPS despite contacting the USPS since his prior firm had used pre-printed Express Mail labels that were not purchased at the USPS.  *Id.*

33.  Aristocrat had been informed by Mr. Owens, who himself was informed by Mr. Islam, of developments (such as the filing of the missing parts by Mr. Islam) that indicated that the '717 application was proceeding through prosecution at the PTO in communications sent to Aristocrat in January and April 2000.  Tr. Exhs. 18, 31**.**

**D.  Mr. Islam's Actions After the PTO's Decision on Petition to Correct Date-In**

34.  The PTO mailed a decision on the Petition to Correct on June 5, 2001 to Shahan Islam at Rosenman & Colin LLP (the "June 2001 Decision").  Tr. Exh. 41.

United States District Court
For the Northern District of California

35.   The June 2001 Decision confirmed that the Petition to Correct was being treated as a petition to withdraw the holding of abandonment and request that the national stage application papers be accepted as being filed on January 10, 2000.  *Id.*

36.   The June 2001 Decision dismissed the relief requested in the Petition to Correct and indicated that the application remained abandoned as of January 11, 2000.  *Id.*

37.   The difference between a denial and a dismissal in the petition process is that the dismissal means the practitioner is free to ask for reconsideration or review of the dismissed petition, which may include submitting additional evidence to address points raised in the PTO decision dismissing the petition.  *Id.*

38.   The June 2001 Decision stated that the Express Mail provisions of 37 C.F.R. § 1.10 had not been satisfied in order to obtain the date of deposit as the date of receipt at the PTO.  *Id.*

39.   The June 2001 Decision stated that the Petition to Correct did not include a copy of the Express Mail mailing label showing some official notation by the USPS of the date of deposit as required under Section 1.10(c), and that sufficient corroborative evidence had not been provided under Section 1.10(d).  *Id.*

40.   The June 2001 Decision stated that a request for reconsideration of the Decision needed to be filed within 2 months of the date of the Decision, but that extensions of time could be obtained under 37 C.F.R. § 1.136(a).  *Id.*

41.   Mr. Islam testified that he does not remember receiving the June 2001 Decision in June of 2001.  *See, e.g.*, Islam 5/24/07, Tr. at 159-160, 162; Islam 1/7/11, Tr. at 93.

42.   The '717 Application remained abandoned after June 2001.  Tr. Exh. 71.

43.   On November 28, 2001, FB Rice sent an e-mail inquiry to Cheryl Bajana, Mr. Islam's secretary, inquiring about the status of the '717 application, and indicating an interest in expediting the examination and making some amendments to the application.  Tr. Exh. 49.

44.   On December 10, 2001, FB Rice made a further request for a status report on the '717 application in an email addressed to Mr. Islam.  Tr. Exh. 50.

45.   On December 17, 2001, Mr. Islam responded by email to inquiries from Mr. Owens about the '717 application.  Tr. Exh. 51.

United States District Court
For the Northern District of California

46.  Mr. Islam wrote the following in his December 17, 2001 email to Mr. Owens:

I gravely apologize for the delay – I should have mentioned that it has been very difficult to obtain the status on this application.

Last Friday we have learned that the application won't be examined for at least another nine months(!) so in view of the backlog in the art unit which will handle this.

*Id.*

47.  Mr. Islam's December 17, 2001 email did not mention that the '717 application was abandoned.  *Id.*

48.  In his December 17, 2001 email, Mr. Islam wrote to Mr. Owens that "[t]hings are crazy here and we are involved in a merger situation too."  *Id.*

49.  In his December 17, 2001 email, Mr. Islam suggested that a petition for accelerated examination of the '717 application be filed.  *Id.*

50.  On December 20, 2001, Mr. Owens sent Mr. Islam the amended set of claims for the '717 application in an email.  Tr. Exh. 54.

51.  In his December 20, 2001 email, Mr. Owens attached a complete amended set of claims for the '717 application for Mr. Islam to file.  *Id.*

52.  In a December 20, 2001 email, Mr. Islam told Mr. Owens that he had briefly reviewed the amended claims, and that a petition for accelerated examination for the '717 application as well as a preliminary amendment for the '717 application would be prepared and filed by the end of the year.  Tr. Exh. 55.

53.  On December 27, 2001, Mr. Islam forwarded his December 20, 2001 email to Mr. Owens to another prosecutor at his firm, Serle Mosoff, saying "Let's discuss."  *Id.*

54.  Mr. Mosoff was not listed as a prosecuting attorney in the '717 application.

55.  On January 23, 2002, Anthony Smith of the PTO Petitions Office faxed a copy of the Decision to the attention of Mr. Mosoff.  Mr. Islam thinks he saw this fax, but thinks it is possible it could have been some weeks or months after January 23, 2002 when he did so.  Tr. Exh. 17.

56. Mr. Islam probably saw the June 2001 Decision sometime between June 2001 and January 2002. However, due to his disorganize practice (described below), he did not respond to the PTO until July 18, 2002.

**E. Mr. Islam's Petition to Revive the '717 Application for Unintentional Abandonment**

57. On July 18, 2002, a petition for revival of the '717 application for unintentional abandonment was filed in the PTO, entitled "Petition for Revival Of An Applicatio[n] For Patent Abandoned Unintentionally Under 37 CFR 1.137(b)" ("Petition to Revive") Tr. Exh. 71.

58. The Petition to Revive was in the form of a copy of Form PTO/SB/64 (10-00) provided by the PTO for the purpose of petitioning for revival of an abandoned patent application under 37 C.F.R. § 1.137(b). *Id.*

59. Mr. Islam's Petition to Revive the '717 Application included the statement that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition under 37 CFR 1.137(b) was unintentional." *Id.*

60. Mr. Islam signed the Certificate of Mailing at the bottom of the Petition to Revive, but did not sign below the "Statement," although Mr. Islam's name was printed and his signature was below. *Id.*

61. On July 18, 2002, a petition for accelerated examination for the '717 application ("Petition for Accelerated Examination") and Mr. Islam's declaration in support were filed in the PTO. Tr. Exh. 153.

62. On July 18, 2002, the Second Preliminary Amendment for the '717 application ("Second Preliminary Amendment") was filed in the PTO. *Id.*

63. Mr. Islam reported the filing of the Petition for Accelerated Examination and Second Preliminary Amendment to Mr. Owens in a letter dated July 19, 2002. Tr. Exh. 68.

64. Mr. Islam, however, did not mention the Petition to Revive in his July 19, 2002 letter to Mr. Owens. *Id.*

65. Further, the copy of the Second Preliminary Amendment that Mr. Islam sent to Mr. Owens on July 19, 2002 incorrectly stated that it was deposited in Express Mail on January 3, 2002, was addressed from the Rosenman law firm prior to its merger with KMZ in February 2002, and had

an Express Mail mailing label number that was slightly different from the Second Preliminary

Amendment filed with the PTO on July 18, 2002.  Tr. Exh. 69.

66.  The Second Preliminary Amendment that Mr. Islam sent to Mr. Owens was never filed

in the PTO.  Aristocrat's Second Amended Answer at ¶ 268.  The Second Preliminary Amendment

that Mr. Islam filed in the PTO was never sent to Mr. Owens.  *Id.* at ¶ 269.

**F.  Facts Suggesting that Neither Islam Nor Aristocrat Intentionally Delayed**

67.  Until June 2001, Mr. Islam had attempted to appropriately respond to the PTO's Notice

of Abandonment by filing the Petition to Correct.

68.  Mr. Islam had no benefit to gain by allowing the '717 application to become abandoned

and remain abandoned.

69.  Aristocrat always wanted to diligently prosecute the '717 application, and in late 2001

asked to expedite the '717 application, not knowing it was in an abandoned status at that time.

70.  Aristocrat never instructed any of its outside patent prosecutors, including Mr. Owens

and Mr. Islam, to abandon the '717 application or allow the '717 application to remain abandoned.

71.  Aristocrat had no benefit to gain by allowing the '717 application to become abandoned

and remain abandoned.

72.  Based upon information received from Mr. Islam, through FB Rice and Mr. Owens,

Aristocrat believed that the '717 application was proceeding through the PTO examination process at

all times between January 10, 2000 and January 2004.  Such information included letters and email

sent by FB Rice to Aristocrat in January 2000, April 2000, December 2001, August 2002, and

January 2004.

73.  Aristocrat was unaware prior to 2004 that the '717 application had gone abandoned as of

January 11, 2000 and was unaware that a petition to revive had been filed and granted in 2002.

**F.  Condition of Islam's Practice**

74.  When Mr. Islam joined Rosenman in April 2000, Rosenman did not have an intellectual

property department.  *See* Tr. Exh. 89; Testimony of Harris Wolin, Tr. at 352; Islam 1/7/11, Tr. at

271.

No. C-06-003717 FINDINGS OF FACT AND CONCLUSIONS OF LAW (Claim of Inequitable Conduct with Respect to Petition to Revive Abandoned Patent Application)
C-06-003717

United States District Court
For the Northern District of California

75. While at Rosenman, Mr. Islam had little support for his practice.  Testimony of Harris Wolin, Tr. at 355, 357.

76. While at Rosenman, Mr. Islam set up a paper calendar for tracking patent prosecution matters which consisted of entering deadlines by hand.  *Id.* at 355-356, 358.

77. While at Rosenman, Mr. Islam did not personally enter any deadlines in the paper calendar for tracking patent prosecution matters.  Islam 1/7/11, Tr. at 273, 279-281.

78. While at Rosenman, Mr. Islam's secretary was responsible for pulling the files for Mr. Islam's review as due dates approached for responses to Office Actions for patent applications.  *Id.*

79. In October 2000, Mr. Islam began working with a new secretary, Cheryl Bajana.  *Id.* at 280-281.

80. Ms. Bajana had no intellectual property training prior to working with Mr. Islam at Rosenman.  *Id.*

81. While at Rosenman, Ms. Bajana's duties included entering deadlines by hand in the paper calendar for Mr. Islam's patent prosecution matters.  *Id.* at 281.

82. While at Rosenman, Ms. Bajana was required to review the paper calendar on a regular basis for upcoming due dates.  *Id.* at 280-281.

83. While at Rosenman, for any upcoming deadlines, Ms. Bajana was required to bring the relevant file to Mr. Islam for preparation of the response to a particular Office Action.  *Id.* at 281-283.

84. In February-March 2002, Rosenman merged with Katten Muchin Zavis to become the law firm of Katten Muchin Zavis Rosenman ("KMZR").  (Stipulated).

85. Eight other Aristocrat applications went abandoned while being prosecuted by Mr. Islam at Rosenman in addition to the abandonment of the '717 application (referred to as the "nine abandoned applications") – 09/308,005, 09/462,717 (application at issue), 09/701,168, 09/720,042, 09/720,046, 09/720,570, 09/743,950, 09/856,869, 09/857,040.  Tr. Exhs. 153, 156, 158-164.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

86. All nine abandoned applications were abandoned, or in the case of the '717 application, remained abandoned for failure to respond to PTO communications sent to Mr. Islam between January 10 and June 27, 2001. *Id.*

87. Mr. Islam filed petitions to revive six Aristocrat applications between July 18 and 23, 2002 – application nos. 09/462,717 (application at issue), 09/701,168, 09/720,042, 09/720,046, 09/720,570, and 09/743,950. *Id.*

88. Mr. Islam left KMZR on April 11, 2003. Testimony of Harris Wolin, Tr. at 353.

89. Mr. Islam did not inform Aristocrat of the abandonment of the nine abandoned Aristocrat applications before he left KMZR in April 2003. (Stipulated).

90. Due to his disorganized practice (*see* testimony of Harris Wolin, Tr. at 354-55), Mr. Islam carelessly and unintentionally failed to diligently prosecute the '717 application.

91. Mr. Islam attempted to cover-up his failure to diligently prosecute the '717 application because he knew his actions contradicted Aristocrat's express interests.

**G. PTO Grants Petition**

92. The PTO granted the Petition to Revive the '717 application in a decision mailed September 3, 2002 and signed by Mr. Anthony Smith. Tr. Exh. 77.

93. The PTO stated that "applicant's statement that 'the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition under 37 CFR 1.137(b) was unintentional' meets the requirements of 37 CFR 1.137(b)(3)." *Id.*

94. Even though the PTO could have done so, it did not seek more information as to the unintentional delay in its decision granting the Petition to Revive. *Id.*; *see also* MPEP 711.03(c)(III)(D).

95. On October 1, 2002, the PTO mailed a Notice of Acceptance of Application Under 35 U.S.C. § 371, indicating that the date of receipt of all § 371 requirements was April 10, 2000, the date the missing parts had been filed. Tr. Exh. 80.

96.  Further, the PTO decision granting the Petition to Revive the '717 application expressly acknowledged the unsuccessful Petition to Correct and the 13 months that had passed between the June 2001 Decision and the Petition to Revive.  Tr. Exh. 77.

**H.  Aristocrat Learns of Abandonment and Islam's Delay and Deception**

97.  The PTO took no action on the '717 Application between its revival on October 1, 2002 and June 7, 2004.  Tr. Exhs. 118, 122.

98.  In May 2003, KMZR sent a filing receipt for the '717 application to Mr. Owens, indicating that the application was now complete and would enter prosecution on the merits.  Tr. Exh. 82.

99.  In January 2004, Aristocrat instructed Mr. Owens to ask KMZR to expedite the prosecution of the '717 application.  Tr. Exh. 95.

100.  On January 27, 2004, Harris Wolin, an attorney at KMZR who had taken over the '717 application, informed Mr. Owens that the PTO had never removed the '717 application from the abandonment section of the PTO in September 2002 when the Petition to Revive had been granted.  Tr. Exh. 100.

101.  On January 27, 2004, Mr. Wolin told Mr. Owens that, in 2001-2002, Mr. Islam had allowed the '717 application to go abandoned based on the same failure to meet administrative deadlines that had led to the abandonment of the NuGame applications.  Tr. Exh. 99.  Mr. Wolin apologized for any inconvenience this caused, but said that the '717 application had already been revived.  *Id.*

102.  In or about April 2003, Aristocrat learned of five Aristocrat applications that were currently abandoned, which were related to inventions developed by a company that Aristocrat had previously acquired called NuGame (patent applications 09/701,168, 09/720,042, 09/720,046, 09/720,570, 09/743,950) (the "NuGame applications").  Tr. Exh. 158-162.

103.  In April 2003, Aristocrat hired Kendall Thiessen of Gibson, Dunn & Crutcher to revive the NuGame applications.  Testimony of David Greenslade, Tr. at 310-311.

United States District Court
For the Northern District of California

1

104.  As a result of Mr. Thiessen's efforts to revive the NuGame applications, Aristocrat

2

learned that Mr. Islam had let the NuGame applications go abandoned and remain abandoned

3

between 2001-2002.  *Id.* at 310-311.

4

105.  In light of the problems with the NuGame applications, Aristocrat moved its patent

5

prosecution files from KMZR to the firm of McAndrews, Held & Malloy ("McAndrews") in early

6

March, 2004.  Tr. Exh. 127.

7

106.  Aristocrat and McAndrews did not take any further action concerning Mr. Islam or the

8

'717 application because Aristocrat was informed at all times that Mr. Islam's many abandonments

9

and the subsequent revivals were due to failures to meet administrative deadlines and not any

10

intentional delay or misrepresentations to the PTO.  *See* Tr. Exh. 99; Testimony of David

11

Greenslade, Tr. at 319.

12

107.  Aristocrat, FB Rice and McAndrews were all unaware that Mr. Islam had sent Mr.

13

Owens an incorrectly dated Second Preliminary Amendment until years after the patents had issued

14

and this litigation had commenced.  Owens 2/16/11, Tr. at 166-168.

15

108.  Upon timely payment of the issue fee, the '717 application issued as U.S. Patent No.

16

7,056,215 on June 6, 2006.  Tr. Exh. 153.

17

109.  A request for a certificate of correction was filed June 9, 2006, to correct certain

18

typographical errors in the patent.  *Id.*

19

110.  A certificate of correction issued on August 15, 2006.  *Id.*

20

111.  The '717 application is the parent of the application that issued as U.S. Patent No.

21

7,108,603 (the '603 patent).  *See* '603 patent at pg. 1.

22

112.  The '603 patent issued on September 19, 2006.  *Id.*

23

**II.  Conclusions of Law**

24

**A.  Applicable Law**

25

**1.  Inequitable Conduct**

26

"[C]ourts must ensure that an accused infringer asserting inequitable conduct has met his

27

burden on materiality and deceptive intent with clear and convincing evidence before exercising its

28

**United States District Court**
For the Northern District of California

discretion on whether to render a patent unenforceable." *Star Sci., Inc. v. R. J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). The Federal Circuit has also noted that "the charge of inequitable conduct in every major patent case 'has become an absolute plague.'" *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1482 (Fed. Cir. 1999) (*quoting Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988)). "The need to strictly enforce the burden of proof and elevated standard of proof in the inequitable conduct context is paramount because the penalty for inequitable conduct is so severe, the loss of the entire patent even where every claim clearly meets every requirement of patentability." *Star Sci.*, 537 F.3d at 1366.

Notable here, inequitable conduct "early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application." *Fox Indus., Inc. v. Structural Preservation Systems, Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1990).

To prevail on a claim of inequitable conduct, the accused infringer must present "evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information or submitted false material information; and (2) intended to deceive the PTO." *Star Sci.*, 537 F.3d at 1365. The party asserting inequitable conduct must prove a threshold level of materiality and intent. Thereafter, the court must determine whether the questioned conduct amounts to inequitable conduct by balancing the levels of materiality and intent, "with a greater showing of one factor allowing a lesser showing of the other." *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006) (citation omitted).[2]

Information is material when a reasonable examiner would consider it important in deciding whether to allow an application to issue as a patent. *Star Sci., Inc.*, 537 F.3d at 1367. Moreover, the PTO's own Rule 56 sets forth a duty to disclose all material information: "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to the material to patentability as defined in this section." 37 C.F.R. § 1.56.

---

[2] On April 26, 2010, the Federal Circuit granted rehearing *en banc* in *Therasense, Inc. v. Becton, Dickinson & Co.*, 2010 WL 1655391 (Fed. Cir. 2010) to consider several detailed questions regarding inequitable conduct.

The intent required for inequitable conduct is a specific intent to deceive the PTO. *Star Sci., Inc.*, 537 F.3d at 1366.  However, the intent to deceive is generally proven by indirect and circumstantial evidence, not direct evidence. *Id.*  That said, the inference of intent to deceive the PTO must be "the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." *Id.*

But even if the factual threshold showings of materiality and intent are made by clear and convincing evidence, the court "must still balance the equities to determine whether the applicant's conduct warrants holding the entire patent unenforceable." *Star Sci., Inc.*, 537 F.3d at 1365.  "It is also inequitable to strike down an entire patent where the patentee only committed minor missteps or acted with minimal culpability or in good faith." *Id.*

### 2.  Petition to Revive

Where there is no dispute that an application is abandoned, a petition to revive under 37 C.F.R. § 1.137 is necessary to reinstate the application to a pending status.  A petition to revive requires (1) a fee, (2) the filing of any response which the failure to file had given rise to the abandonment, and (3) a showing that the delay in filing a timely reply was either unavoidable or a statement the entire delay was unintentional.  37 C.F.R. § 1.137(a) and (b), respectively; *see also* MPEP 711.03(c)(III)(C)(1) and (2).

MPEP 711.03(c)(III)(D) explains that there are three periods to be considered during the evaluation of a petition under 37 CFR § 1.137:

> (A) the delay in reply that originally resulted in the abandonment;
>
> (B) the delay in filing an initial petition pursuant to 37 CFR 1.137 to revive the application; and
>
> (C) the delay in filing a grantable petition pursuant to 37 CFR 1.137 to revive the application.

The MPEP goes on to explain the PTO's standard for evaluating delay:

> [T]he abandonment of an application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as "unintentional" within the meaning of 37 CFR 1.137(b), where the applicant deliberately permits the application to become abandoned.  Likewise, where the applicant deliberately chooses not to seek or persist in seeking the revival of an abandoned application, or where the applicant deliberately chooses to delay seeking revival of the abandoned application, the resulting

delay in seeking revival of the abandoned application cannot be considered as "unintentional" within the meaning of 37 CFR 1.137(b).

MPEP 711.03(c)(III)(D).

*Unavoidable Delay*

When determining whether a delay should be considered unavoidable, the PTO follows a "reasonably prudent person standard" that requires no more or greater care or diligence than is generally employed by prudent and careful individuals in relation to their most important business. MPEP 711.03(c)(III)(C)(2).  A petition to revive for unavoidable delay requires a showing to the satisfaction of the Director that the entire delay was unavoidable in spite of the exercise of due care and diligence expected of a reasonably prudent person under the circumstances.  37 C.F.R. § 1.137(a)(3).

*Unintentional Delay*

Particularly important here is that the unintentional delay standard is less strict.  Congress created this standard in 1982 when it enacted the unintentional delay standard of 35 U.S.C. § 41(a)(7), implemented in 37 C.F.R. § 1.137(b) and MPEP 711.03(c)(III)(C).

The PTO has provided examples of situations where a delay resulting from a deliberately chosen course of action on the part of an applicant is not "unintentional" delay within the meaning of 37 C.F.R. § 1.137(b):

    (A)    the applicant does not consider the claims to be patentable over the references relied upon in an outstanding Office action;

    (B)    the applicant does not consider the allowed or patentable claims to be of sufficient breadth or scope to justify the financial expense of obtaining a patent;

    (C)    the applicant does not consider any patent to be of sufficient value to justify the financial expense of obtaining the patent;

    (D)    the applicant does not consider any patent to be of sufficient value to maintain an interest in obtaining the patent; or

    (E)    the applicant remains interested in eventually obtaining a patent, but simply seeks to defer patent fees and patent prosecution expenses.

MPEP 711.03(c)(III)(C)(1).  Each of these examples shows either (1) a conscious decision to abandon the application; or (2) a conscious decision to deliberately delay prosecuting to avoid or at least postpone any additional expenses.

**United States District Court**
For the Northern District of California

1   Petitions to revive based on unintentional delay are based upon statements, rather than a

2 showing accompanied by documentary evidence as required for showing unavoidable delay.  MPEP

3 711.03(c).  In fact, the PTO does not generally question whether there has been an intentional delay

4 or otherwise impermissible delay in filing an initial petition to revive if the petition is filed: (A)

5 within 3 months of the date the applicant is first notified that the application is abandoned, and (2)

6 within 1 year of the date of abandonment of the application.  MPEP 711.03(c)(III)(D).  When a

7 petition pursuant to 37 C.F.R. § 1.137(b) is not filed within 3 months of the date the applicant is first

8 notified that the application is abandoned, the PTO may require further information as to the cause

9 of delay between the date the applicant was first notified that the application was abandoned and the

10 date a 37 C.F.R. § 1.137(b) petition was filed, and how such a delay was "unintentional."  MPEP

11 711.03(c)(III)(D).  And when a petition pursuant to 37 C.F.R. § 1.137(b) is not filed within 1 year of

12 the date of abandonment of the application, the PTO will typically, but not always, require further

13 information as to how the delay in discovering the abandoned status occurred.  MPEP

14 711.03(c)(III)(D).

15   Several responses to comments in the Federal Register are helpful in determining whether a

16 delay is in fact "unintentional."  *See* Changes to Patent Practice and Procedure, 62 Fed. Reg. 53131

17 (Oct. 10, 1997).  One response makes clear that an "'unintentional' delay does not require that the

18 delay have occurred despite the exercise of due care and diligence (as does 'unavoidable' delay)."  *Id.*

19 at 53161. Another response notes that "[a]ny applicant obtaining revival based upon a misleading

20 statement that the delay was unintentional may find the achievement short-lived as a result of the

21 question of intentional delay being raised by third parties challenging any patent issuing from the

22 application."  *Id.* at 53162.  Finally, one response warns that "an applicant who fails to file a petition

23 under § 1.137 . . . (b) 'promptly' upon becoming notified, or otherwise becoming aware of

24 abandonment of the application . . . will probably not even be able to make an appropriate statement

25 that 'the entire delay in filing the required reply from the due date for the reply until the filing of the

26 a grantable petition was unintentional.'" *Id.* at 53163.

27   The parties both had experts on the subject of inequitable conduct and more specifically,

28 intentional delay within the meaning of 37 C.F.R. § 1.137(b) (Charles Van Horn for Aristocrat and

United States District Court
For the Northern District of California

1   Paul Gardner for IGT).  The court expressed reluctance to allow such experts to testify, but both

2   sides expressed a desire to offer the experts, pointing out that some of the rules at issue were obscure

3   or complex.  The court found the expert testimony helpful in explaining the prosecution of PCT

4   applications before the PTO, but the majority of the testimony reflected legal conclusions and

5   blatant advocacy for a respective party's position.  At bottom, the experts' legal conclusions were not

6   helpful, and the court has drawn its own conclusions as to what the facts show.

7           **B.  Mr. Islam's Delay Was Unintentional**

8           IGT has failed to show by clear and convincing evidence that at any time, Mr. Islam's delay in

9   prosecuting the '717 application was intentional.

10          Considering the period of delay that initially led to the notice of abandonment, Mr. Islam's

11  filing of the national stage application one day late does not show intentional delay.  Moreover, Mr.

12  Islam's filing of the Petition to Correct on September 19, 2000 is inconsistent with an intent to delay

13  prosecution or revival.  While Mr. Islam could have simultaneously filed a petition to revive with the

14  Petition to Correct, his failure to do so is not enough to make the delay "deliberate."  *See* MPEP

15  711.03(c)(I) ("Where an applicant contends that the application is not in fact abandoned (*e.g.*, there

16  is disagreement as to the sufficiency of the reply, or as to controlling dates), a petition [to the

17  Director] under 37 C.F.R. 1.181(a) requesting withdrawal of the holding of abandonment is the

18  appropriate course of action . . . .").  Rather, Mr. Islam's decision to file the Petition to Correct

19  demonstrates, like many of his actions do, a desire to avoid telling Aristocrat of his mistakes.

20  Despite its procedural shortcoming, Mr. Islam's decision to file a Petition to Correct shows that there

21  was no deliberate course of action to delay prosecuting the '717 application.  Up to the June 2001

22  Decision on the Petition to Correct, Mr. Islam's actions were not consistent with a deliberate

23  delay–he filed the national stage application and a preliminary amendment, he filed a reply to the

24  Notice of Missing Parts, and he filed a Petition to Correct.

25          There is also no clear and convincing evidence that Mr. Islam deliberately delayed during the

26  period from the June 2001 Decision up to the July 2002 Petition to Revive.  Notably, there is no

27  evidence to suggest that Mr. Islam had anything to gain from deliberate delay.  Indeed,  IGT does

28  not suggest that prosecution was delayed due to prior art considerations, the financial worth of the

1    patent, or the scope of the claims.  To the contrary, the evidence shows that Aristocrat consistently

2    instructed Mr. Islam (through Mr. Owens) to diligently prosecute the '717 application.

3         Mr. Islam testified that he did not recall the June 2001 Decision.  Considering that it was

4    correctly addressed and was also faxed to Mr. Mosoff, it is likely that Mr. Islam saw the June 2001

5    decision at some point shortly after it was mailed.  In fact, Mr. Islam's testimony was disturbingly

6    vague and his lack of memory difficult to believe.  However, the evidence does not suggest that Mr.

7    Islam deliberately decided to defy Aristocrat and Mr. Owens and intentionally delay prosecuting the

8    '717 application.  Rather, the evidence shows that Mr. Islam's practice was so disorganized that he

9    failed to properly docket or schedule further action on the June 2001 decision and failed to keep

10   track of what he needed to do for his clients.  As described by Mr. Wolin, Mr. Islam was

11   overwhelmed and his practice was out of control and susceptible to error.  Mr. Islam also relied on

12   an inefficient notebook docketing system.  During this same time period, eight other Aristocrat

13   applications become abandoned.  Even if Mr. Islam failed to properly prosecute the '717 application,

14   "unintentional" delay does not require that the delay have occurred despite the exercise of due care

15   and diligence (as does "unavoidable" delay).  *See* Changes to Patent Practice and Procedure, 62 Fed.

16   Reg. 53131, 53161 (Oct. 10, 1997).

17        Mr. Islam's failure to disclose developments regarding the abandonment of the '717

18   application to Mr. Owens actually suggests that the delay was unintentional.  Specifically, it shows

19   that Mr. Islam did not want to disclose his errors because he was likely embarrassed by his failure to

20   act in accordance with his client's instruction.  Had it been granted, Mr. Islam's Petition to Correct

21   would have avoided abandonment altogether.  Mr. Islam's deflections in December 2001 show that

22   he was fully aware that Aristocrat wished to proceed with the '717 application.  Mr. Islam's

23   comments to Mr. Owen's regarding the PTO backlog at the time further avoided acknowledging any

24   personal responsibility for delay but it may have been correct, especially considering that the '717

25   application remained in an abandoned state even after the PTO had officially revived it.  Still further,

26   Mr. Islam's incorrectly dated Second Preliminary Amendment is further evidence that Mr. Islam's

27   chief motive was to hide his failures from Aristocrat.  Once the June 2001 Decision was sent, a

28

United States District Court
For the Northern District of California

1  decision to deliberately delay reviving the '717 application would not have helped to hide his errors

2  from Aristocrat.

3      Accordingly, the court finds that the entire delay from January 10, 2000 to July 18, 2002 in

4  filing the Petition to Revive the '717 application, although reflective of substandard practice, was

5  "unintentional" within the meaning of 37 C.F.R. § 1.137(b).

6      **C. There Was No Material Information Withheld From The PTO With An Intent To
        Deceive**

7
       Because Mr. Islam did not intentionally delay prosecuting the '717 application, his statement

8  in the Petition to Revive the '717 application that "[t]he entire delay in filing the required reply until

9  the filing of a grantable petition under 37 C.F.R. 1.137(b) was unintentional" was not false when

10  filed on July 18, 2002.  Therefore, Mr. Islam's statement in the Petition to Revive was not a material

11  misrepresentation and was not made with an intent to deceive.

12      Moreover, there was no material information that wasn't already before the PTO when Mr.

13  Islam filed the Petition to Revive.  Anthony Smith of the PTO Petitions Office faxed a copy of the

14  June 2001 Decision and was thus aware of Mr. Islam's delay in responding.  The PTO could have

15  asked for more information, but did not do so.  *See* 711.03(c)(III)(D).  To be sure, the PTO may rely

16  on the good faith and candor of practitioners in evaluating petitions to revive, recognizing that future

17  litigation might uncover intentional delay at a future date.  *See* Changes to Patent Practice and

18  Procedure, 62 Fed. Reg. 53131, 53163 (Oct. 10, 1997).  But here, the evidence that IGT principally

19  relies on was squarely before the PTO, namely the Petition to Correct and the passage of time before

20  the Petition to Revive was filed.

21      Furthermore, Aristocrat did not fail to disclose material information to the PTO.  Aristocrat,

22  through Mr. Owens, did not find out that the '717 application had been previously abandoned until

23  2004. Tr. Exh. 99.  By that time, the PTO had already granted the Petition to Revive.  As a result,

24  neither Aristocrat nor its outside prosecution counsel had reason to believe that the abandonment

25  and subsequent prosecution delay (information which was already before the PTO) was material to

26  patentability.  Similarly, the concealment of the abandonment from Aristocrat was not material to

27  the revival of the '717 application because it did not involve a misrepresentation to the PTO.

28

United States District Court
For the Northern District of California

1   Therefore, the court concludes that Aristocrat (including its patent prosecutors) did not intend to

2   deceive the Patent Office in the Petition to Revive the '717 application.  Moreover, Aristocrat and its

3   patent prosecutors did not violate any applicable duty of candor and good faith by not disclosing Mr.

4   Islam's mismanagement, concealment of abandonment from his client, and subsequent revival of the

5   '717 application because it was not material to patentability.

6           Because there is no clear and convincing evidence of inequitable conduct, the '215 patent and

7   all patents that are derived from or claim priority to it are not unenforceable due to inequitable

8   conduct.  Moreover, the '603 patent and all patents that are derived from or claim priority to it are

9   not unenforceable due to inequitable conduct.

10          **D.  Balancing Equities**

11          Even if IGT had shown by clear and convincing evidence that Mr. Islam intentionally

12  delayed pursuit of the Petition to Revive and withheld that information from the PTO with the

13  specific intent to deceive, the court "must still balance the equities to determine whether the

14  applicant's conduct warrants holding the entire patent unenforceable."  *Star Sci., Inc.*, 537 F.3d at

15  1365.  Here, Aristocrat at all times unequivocally wanted the prosecution of the '717 application to

16  proceed without delay.  Although any failures by Mr. Islam to carry out his client's instructions are

17  attributable to Aristocrat as his client vis-a-vis third parties such as the PTO (*see Link v. Wabash R.*

18  *Co.*, 370 U.S. 626, 633-634 (1962), *but see In re Lonardo*, 17 U.S.P.Q. 2d 1455, 1459 (Comm'r Pat.

19  1990)), in balancing the equities, consideration must be given to the fact that Mr. Islam's inaction

20  was in direct conflict with Aristocrat's directions.  In addition, any inequitable conduct was not

21  related to substantive patentability, but rather, to a procedural irregularity caused by the prosecuting

22  attorney's failure to diligently prosecute in direct conflict with his client's instructions and without its

23  knowledge.  Although for the reasons explained in a prior appeal in this case, a procedural

24  irregularity that involves misrepresentation and deception may render a patent unenforceable

25  (*Aristocrat Tech. Australia Pty. Ltd. v. Intern. Game*, 543 F.3d 657, 663-64 (Fed. Cir. 2008)), to

26  invalidate Aristocrat's entire family of patents when Aristocrat reasonably believed it was complying

27  with the PTO's requirements would not be equitable.  On balance, a finding of inequitable conduct

28

1   would be unwarranted even if Mr. Islam's statement of unintentional delay was a material

2   misrepresentation intended to deceive the PTO.

3

4

5

6

7   Dated: _____5/6/2011_____

8                                                               RONALD M. WHYTE
                                                                United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California